UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE NBC UNIVERSAL, INC. | ) No. 06-MC-79 (JBW)<br>)<br>) MEMORANDUM & ORDER ON<br>) MOTION FOR RECONSIDERATION<br>) |

Appearances:

For NBC Universal, Inc.:
    NBC Universal, Inc.
    New York, New York
    By:    Hilary Lane

For Newsday, Inc.:
    Newsday, Inc.
    New York, New York
    By:    Kay Murray

For the United States:
    United States Attorneys Office
    Eastern District of New York
    Brooklyn, New York
    By:    Mitra Hormozi
            Joseph Lipton
            Deborah Sue Mayer

For Defendant:
    Rubinstein & Corozzo LLP    Law Offices of Gerald L. Shargel
    New York, New York    New York, New York
    By:    Joseph R. Corozzo, Jr.    By:    Henry Mazurek

For the Gotti Family:
    Law Office of Seth Ginsberg
    New York, New York
    By:    Seth Ginsberg



JACK B. WEINSTEIN, Senior District Judge:

In this RICO conspiracy prosecution members of the press moved for the release of audio-video recordings introduced by the government in support of its motion to disqualify defense counsel. The motion was granted in part. *See United States v. Pizzonia*, No. 04-CR-425, 2006 WL 354308 (E.D.N.Y. Feb. 14, 2006). NBC Universal, Inc. moves for reconsideration of that order. The order is modified to permit release at the close of trial, subject to intervention by the Gotti family to seek a permanent order preventing release at any time.

I.  Facts

Defendant Dominick Pizzonia is accused of participating in a racketeering conspiracy involving homicide, loan-sharking, and extortion. He is alleged to be an officer of the Gambino crime family. Claiming multiple conflicts of interest, the government moved for disqualification of defendant's attorney, Joseph Corozzo. That motion was denied. *See United States v. Pizzonia*, 415 F. Supp. 2d 168 (E.D.N.Y. Feb. 14, 2006).

At the disqualification hearing, in open court with members of the press present, the government placed in evidence and played two audio-video recordings of defense counsel visiting with John Gotti, Sr.—the late head of the Gambino family—at the United States Medical Center for Prisoners in Springfield, Missouri. The next day, members of the press moved for release of the recordings. Defense counsel objected on both Gotti's behalf, citing the attorney-client privilege; and on defendant's behalf, on the grounds that airing the recordings on television would unfairly prejudice any jury impaneled in his case. While notice of the hearing was ordered to be given to the Gotti family, no member was present to object to the recordings' release on the

grounds that it might invade the privacy of the now-deceased John Gotti, Sr.; on the present motion to reconsider two descendants were present with an attorney, seeking intervention on behalf of Mr. Gotti's children and grandchildren.

The press did not seek to make a television recording of the criminal proceedings themselves, a practice prohibited by the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 53 ("Except as otherwise provided by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom."); *see also In re Application of Nat'l Broad. Co.*, 635 F.2d 945, 952 n.5 (2d Cir. 1980) ("*Myers*") (noting that live broadcasting of testimony "might have some distorting impact upon the content of the evidence or the manner in which it is presented to the jury"). Rather, it requested access to "documents" already in evidence—the audio-video recordings of defense counsel and John Gotti, Sr. meeting in prison.

The motion was granted in part. Transcripts of the disqualification proceedings and of the recordings themselves were released. Members of the press and public were granted the opportunity to review the recordings played in the courtroom; several members of the press did so. Articles describing the proceeding and the recordings were published. *See, e.g.*, John Marzulli, *Haunting Image of Dapper Don Airs*, Daily News, Feb. 15, 2006, at 3; Anthony M. DeStefano, *Judge Won't Release Gotti Tape*, Newsday, Feb. 15, 2006, at A15; Tom Perrotta, *Defendant has Right to Choose Attorney with Alleged Ties to Mafia, Judge Rules*, N.Y.L.J., Feb. 15, 2006, at 1; Zach Haberman, *Judge Oks 'Mob' Lawyer for Defense*, N.Y. Post, Feb 15. 2006, at 8.

NBC Universal, Inc., joined by Daily News, L.P., The New York Times Company, New York Post Holdings, Inc., and Newsday, Inc., have moved for clarification and reconsideration, claiming that the previous ruling "fails to take into account the recent decision of the [Court of Appeals for the] Second Circuit in *Lugosch* [] *v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006) . . . ." Intervenors' Br. 3.

Defendant objects to modification of the order, but concedes that he would not have standing to contest release of the recordings after his trial. Representatives of the Gotti family have indicated that they will formally seek to prevent release at any time.

## II.  Law

Open courts are critical to a democratic society. Access to judicial proceedings and documents is necessary "for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (*"Amodeo II"*)). The rule of law and public acquiescence in judicial decisions demand that courts reveal the bases for their rulings. "Without monitoring . . . the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions." *Lugosch*, 435 F.3d at 119 (quoting *Amodeo II*, 71 F.3d at 1048).

The need for transparency is especially strong in criminal cases. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575, 100 S. Ct. 2814 (1980) ("[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the

manner in which criminal trials are conducted . . . ."). Against this need for transparency must be weighed the rights of an accused to a fair trial "free of prejudice, passion, [and] excitement . . . ." *Sheppard v. Maxwell*, 384 U.S. 333, 350, 86 S. Ct. 1507 (1966) (quoting *Chambers v. Florida*, 309 U.S. 227, 236-37, 60 S. Ct. 472 (1940)). A verdict "induced only by evidence and argument in open court, and not by any outside influence" is essential. *Sheppard*, 384 U.S. at 351.

Both common law and constitutional rights of access to court documents and proceedings have been recognized by the Supreme Court. Underlying these protections is a single rationale—an opportunity for public monitoring of governmental process. *Compare Nixon v. Warner*, 435 U.S. at 598 (common law right of access is based on "the citizen's desire to keep a watchful eye on the workings of public agencies, and . . . a newspaper publisher's intention to publish information concerning the operation of government" (citations omitted)) *with Richmond Newspapers*, 448 U.S. at 575 (First Amendment has the "core purpose of assuring freedom of communication on matters relating to the functioning of government"). The antiquity of the common law on the point supports the existence of the constitutional right. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004) (a history of openness supports a constitutional right of access; courts "have generally invoked the common law right of access to judicial documents in support of finding a history of openness").

## II. Common Law

### A. Law

The common law right of access to courtroom exhibits is not derived from the Constitution, but "predates the Constitution itself." *United States v. Mitchell*, 551 F.2d 1252,

1260 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner*, 435 U.S. 589. It "is not absolute," *Nixon v. Warner*, 435 U.S. at 598; nor is it "of constitutional dimension." *Valley Broad. Co. v. U.S. Dist. Court for Dist. of Nevada*, 798 F.2d 1289, 1293 (9th Cir. 1986) (citing *Nixon v. Warner*, 435 U.S. at 597-98). Documents filed with a court that are "relevant to the performance of the judicial function and useful in the judicial process" are "judicial documents" to which a common law presumption of access attaches. *Lugosch*, 435 F.3d at 119. *See also United States v. Graham*, 257 F.3d 143, 153 (2d Cir. 2001) (holding that although they were not entered into evidence, videotapes played at a pretrial detention hearing were "judicial records").

Against this need for access must be balanced competing values, such as the Sixth Amendment right to trial by a jury untainted by exposure to irrelevant, prejudicial information. *See Myers*, 635 F.2d at 951 (noting the "high responsibility of courts to assure the accused 'a fair and reliable determination of guilt,' induced only by 'evidence and argument in open court, and not by any outside influence, whether of private talk or public print'" (quoting *Estes v. Texas*, 381 U.S. 532, 564, 85 S. Ct. 1628 (1956) (Warren, C. J., concurring); *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462, 27 S. Ct. 556 (1907))); *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) ("[D]ocuments may be sealed . . . [when] closure is essential to preserve higher values and is narrowly tailored to serve that interest." (internal quotation marks and citation omitted)).

The Court of Appeals for the Second Circuit recognized, in its subtle foundational ruling on the subject, that the strength of the presumption of access varies with the importance of the evidence to judicial decision-making.

> [T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the

resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

*Amodeo II*, 71 F.3d at 1049.

*Amodeo II* identified documents that served as the "principal basis" for a summary judgment motion; were introduced at trial; or were "material and important" to a decision to approve a consent decree as ones to which a strong presumption of access attached by virtue of "the *role those documents played* in determining litigants' substantive rights." 71 F.3d at 1049 (emphasis supplied). A middling presumption of access attached to documents that do "not serve as the basis for a substantive determination . . . ." *United States v. Graham*, 257 F.3d at 151 (citing *Amodeo II*). Without example, *Amodeo II* indicated that documents playing "only a negligible role" in judicial functions had a very low presumption of access. 71 F.3d at 1050. Finally, "[d]ocuments that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the presumption's reach . . . ." *Id.*

The weight to be accorded the right of access to documents in the middle of the continuum was to be determined "by the exercise of judgment . . . ." *Id. See also Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982) ("An exercise of judgment is in order. The importance of the material to the adjudication, the damage disclosure might cause, and the public interest in such materials should be taken into account before a seal is imposed.").

This court's previous order denying immediate release of the audio-video recordings was based in part upon the *Amodeo II* continuum and the factors identified in *Joy* as pertinent to the appropriate exercise of judgment. *See United States v. Pizzonia*, 2006 WL 354308, at *3-*4.
7

The more recent Court of Appeals ruling in *Lugosch*, relied upon as decisive by the media intervenors, does not provide a basis for modification. Though citing the above passage on the "presumption continuum" from *Amodeo II*, 435 F.3d at 119, *Lugosch* could be read as disavowing the Court of Appeals's earlier distinctions between documents that did and did not serve as a basis for decision. *Id.* at 123. It expressly rejected the district court's suggestion in that case that "different types of documents might receive different weights of presumption based on the extent to which they were relied upon in resolving the motion." *Id.* "If the rationale behind access is to allow the public an opportunity to assess the correctness of the judge's decision . . . documents that the judge *should* have considered or relied upon, but did not, are just as deserving of disclosure as those that actually entered into the judge's decision." *Id.* (citation and internal quotation marks omitted; emphasis and alteration in original). The one example the *Amodeo II* court had given of a document to which an intermediate presumption of access attached—one submitted in support of a motion for summary judgment that is denied—has now apparently been assigned the highest presumption of access. *Compare Amodeo II*, 71 F.3d at 1049 ("[W]here a district court denied the summary judgment motion, essentially postponing a final determination of substantive legal rights, the public interest in access is not as pressing." (citation and internal quotation marks omitted) *and Graham*, 257 F.3d at 151 ("[T]he presumption of access to documents that do not serve as the basis for a substantive determination—such as documents submitted on a motion for summary judgment which is denied, thus leaving a decision on the merits for another day—is appreciably weaker.") *with Lugosch*, 435 F.3d at 123 ("[T]he weight of the presumption given to such documents . . . is of the highest . . . .").

The *Lugosch* court did not purport to replace the old "continuum" the Court of Appeals had previously adopted; but it appears that *Lugosch* adopted a scheme of applying varying weights of presumption to types of motions or practices, not to particular documents filed in support of those motions. What is left of the *Amodeo II* continuum would seem to be a low end populated by discovery practice or other pretrial interactions at which the court is primarily a spectator (but query whether that would change if the court were required to address a critical issue, e.g., a discovery dispute) and a high end made up of dispositive motions (such as summary judgment) and exhibits submitted at trial. Between these extremes would, under *Lugosch*, appear to fall every other motion or procedural device, calling for the "exercise of judgment." *Amodeo II*, 71 F.3d at 1050.

No concrete examples were added to the continuum by *Lugosch*. Since the district court's error in that case was, after a delay of 17 months, *id.* at 117, "not mak[ing] any determinations under the [legal] frameworks," 435 F.3d at 120-1, the Court of Appeals remanded for "specific, on-the-record findings that higher values necessitate a narrowly tailored sealing." *Id.* at 126.

## B. Application of Law to Facts

Despite the intervenors' emphasis, *Lugosch* is unilluminating in the present context. It held that a strong presumptive right of access attaches to documents submitted in connection with a dispositive summary judgment motion, *see Lugosch* at 126; the intervenors here seek evidence submitted in connection with a motion to disqualify defense counsel—a matter having nothing to do with the merits of the prosecution. *See Pizzonia*, 2006 WL 354308, at *1.

*Lugosch* reprimanded the district court for failing to rule on the intervenors' motion after 17 months, *see* 435 F.3d at 117; here, within days, a ruling was handed down on the media's motion that took into account the competing values identified by the Court of Appeals for the Second Circuit. *See Pizzonia*, 2006 WL 354308 at *3-4. *Lugosch* concerned the impropriety of denying the media and the public any access to the contested documents by sealing the submissions, *see* 435 F.3d at 113-4, and refusing to hold oral argument, which the media could have attended. *See id.* at 114, 117. Nothing has been sealed in this instance. Both the public and press have been free to attend all proceedings and to have full access to transcripts of the recordings and proceedings, as well as the opportunity to view and review the recordings at the courthouse. *See Pizzonia*, 2006 WL 354308 at *4.

The other case emphasized by the media intervenors, *Myers*, is distinguishable. A cursory reading of the following broad statement from the Court of Appeals for the Second Circuit in that case would seem to require release of the audio-video recordings so those not present at the original showing could see them:

> Once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction.

635 F.2d at 952.

The circumstances of the *Myers* litigation differ significantly from those in the instant case. *Myers* grew out of the Abscam investigations, during which numerous state, local, and federal government officials were videotaped negotiating or taking bribes from undercover

agents posed as Middle Eastern businessmen seeking assistance with immigration and other "governmental matters." 635 F.2d at 947. The videotapes were of the criminal conduct; they constituted direct evidence of the operative facts of the crimes charged. Both the conduct of the investigation—its existence was leaked before its planned conclusion—and the outcome of the trials were of intense legitimate citizen concern. *Id.* at 947 (describing the "explosion of publicity in the national and local media."). *See also Lugosch*, 435 F.3d at 123 n.5 (civil defendants were "lobbying the state legislature and the governor to obtain preferred treatment in connection with a business endeavor that is similar to those at issue in this case"). These considerations, of public concern and centrality of the evidence, weighed heavily in the balance.

> The presumption [of access] is especially strong in a case like this where the evidence shows *the actions of public officials,* both the defendants and law enforcement personnel. Though the transcripts of the videotapes have already provided the public with an opportunity to know what words were spoken, there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of a *Member of Congress and local elected officials, as well as agents of the Federal Bureau of Investigation.* And there is a significant public interest in affording that opportunity contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial.

*Myers,* 635 F.2d at 952 (emphasis supplied). Additionally, the entirety of the tapes in *Myers* had already been admitted into evidence at trial, eliminating the risk of jury taint. *Id.* at 953 ("The jury had already heard and seen the tapes . . . . [T]he possibility that the jurors . . . might see the tapes of excerpts unflattering to the appellants again on television did not pose a significant risk to a fair trial."). *See also United States v. Massino,* 356 F. Supp. 2d 227 (E.D.N.Y. 2005) (releasing to the press audio tape recordings already heard by the jury in open court). Potential prejudice to suspects not yet being tried was speculative and did not warrant restriction. *See*

11

*Myers*, 635 F.2d at 954.

The expansive language of *Myers* cannot be divorced from the case's dramatic circumstances: rank corruption by publicly elected officials demonstrated by videotapes admitted as evidence at trial. In this instance, the recordings do not depict public officials and have not been admitted into evidence—nor could they be, since they are irrelevant to defendant's guilt and unduly prejudicial. *Cf. Sheppard*, 384 U.S. at 351 (prejudice from information not admitted at trial "may indeed be greater than when it is part of the prosecution's evidence for it is then not tempered by protective procedures" (citation and internal quotation marks omitted)).

Critical as well is procedural posture: *Myers* upheld a district court's decision to permit reproduction and broadcast of trial evidence, affirming that whether and how to release judicial documents to the public is ultimately a matter of judicial discretion. "[D]isclosure in a particular case [is] normally left to the 'informed discretion' of the courts . . . after 'weighing the interests advanced by the parties in light of the public interest and the duty of the courts.'" *Myers*, 635 F.2d at 950 (quoting *Warner v. Nixon*, 435 U.S. at 602-3). *See also United States v. Beckham*, 789 F.2d 401, 415 (6th Cir. 1986) (affirming trial court's decision to deny permission to copy tape-recordings; "[h]is decision may appear overly cautious, but the primary responsibility for the orderly administration of a criminal trial rested on his shoulders."). The media intervenors have not identified—and this court has not found—any appellate decision reversing a district court denial of permission to reproduce audio- or video-recordings that would not be introduced at trial. Perhaps that lack of authority is due to the strong tendency of trial courts to cooperate with the press in releasing documents dealing with the merits. *See, e.g., In re "Agent Orange"*

*Products Liability Litig.*, 98 F.R.D. 539, 545 (E.D.N.Y. 1983), *cited with approval in Lugosch* at 123 ("Clearly, then, documents attached to and referred to in parties' papers on the summary judgment motions are part of the court record and are entitled to the presumption of public access.").

Defendant's trial is scheduled to commence in three months. He is a private individual accused of crimes that, while serious, do not affect the foundation of our democratic government as would charges of governmental corruption. His interest in preventing jury taint is well-founded—in this district, the Gotti name is inextricably bound with organized crime. The jury will not be shown the recordings; they are irrelevant to defendant's guilt. Under these circumstances, defendant's Sixth Amendment right to a jury unprejudiced by facts not in evidence makes permitting inspection, but not duplication, of the recordings for television broadcast an appropriately narrow limitation of the common law right of public access.

### III. First Amendment

#### A. Law

The First Amendment guarantees the public and press a qualified right to attend criminal trials, *see Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S. Ct. 2613 (1982); *Richmond Newspapers*, 448 U.S. 555, *supra*, and pretrial motions. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10, 106 S. Ct. 2735 (1986). Included is the right to be informed of the evidence placed before the fact-finder. *See, e.g., In re New York Times Co.*, 828 F.2d at 114 (directing district court to unseal and redact portions of documents filed in connection with

motion to suppress wiretap evidence; "a qualified First Amendment right of access extends" to "written documents submitted in connection with judicial proceedings that themselves implicate the right of access.").

The First Amendment demands broader *disclosure* than the common law. *See Lugosch*, 435 F.3d at 124 (the "constitutional burden in requiring disclosure" is "higher"); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) ("The common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment."). The right of disclosure does not necessarily embrace the right to *reproduce* "documents" submitted in support of pre-trial motions. *See In re Providence Journal Co., Inc.*, 293 F.3d 1, 16 (1st Cir. 2002) ("By affording interested members of the media ample opportunity to see and hear the tapes as they are played for the jury, the court has fulfilled its pertinent First Amendment obligations."); *United States v. Beckham*, 789 F.2d at 409 ("The Constitution requires that members of the public and the media have the opportunity to attend criminal trials and to report what they have observed . . . . If a right to copy the tapes . . . exists, it must come from a source other than the Constitution.") (internal citations omitted); *Valley Broad. Co.*, 798 F.2d at 1292-93 ("Any first amendment rights to which existing case law entitled [the media] were amply satisfied by the district court's provision for media access to the trial itself."); *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 427 (5th Cir. 1981) ("Members of the press were allowed to listen as the tapes were played in court; transcripts were prepared and distributed for their use; reporters and broadcasters were free to report this information as they wished. All that was denied them was the right to play these tapes over the air waves; that the Constitution does not

require.").

The First Amendment values served by open trial proceedings—"the appearance of fairness; public confidence in the judicial system; the discouragement of misconduct, perjury or secret bias; the enhancement of the performance of all parties; the protection of the judge from imputations of dishonesty; the education of the public; the provision of a safe outlet for public hostility and concern; the avoidance of covert actions and secret proceedings; and equal treatment of rich and poor," *Beckham*, 789 F.2d at 406-7 (citing *Richmond Newspapers*)—require that citizens know what has transpired in the courtroom. They do not require that they receive that information in the most dramatic form. *Cf.* Fed. R. Crim. P. 53 (prohibiting live broadcasting of criminal proceedings). When a court has placed "no restrictions upon press access to, or publication of any information in the public domain," the Constitution is not implicated. *Nixon v. Warner*, 435 U.S. at 609 (First Amendment did not require that audiotapes be made available for copying).

### B. Application of Law to Facts

The First Amendment right of access has been satisfied. Transcripts of the recordings have been made available to the press and public. Anyone is permitted to review the audio-video recordings at the court. *See Pizzonia*, 2006 WL 354308, at *4. Several members of the press reviewed the recordings both when they were first introduced and again upon request. The tapes were fully described in articles that were published in newspapers available locally and nationwide. *See supra*, I (citing articles).

15

Allowing the duplication and television broadcast of the recordings would substantially hinder defendant's right to a fair trial. If the recordings were released and televised, the media might well fixate on, and sensationalize, them, making it difficult to find jurors who had not seen or heard of them. The newspapers' efforts to dramatize what are, in fact, rather mundane encounters, is a matter of common knowledge. *See, e.g.,* Marzulli, *supra* ("His cheeks are gaunt. His hair is thinning and turning white. The voice is hoarse and slurred. . . . The shocking image of the once Dapper Don, stricken with cancer, was captured by a secret camera . . . ."); DeStefano, *supra* ("At one point Gotti, wrapped in a sweater and seated by a heating vent, playfully hits Corozzo on his knee. The lawyer then pats a dejected looking Gotti on the shoulder."). All of the articles mentioned defendant by name and described the charges against him. There is reason to believe that televised reports could go even further, thus firmly connecting Gotti, the convicted head of the Gambino crime family, with defendant, through his counsel, in the minds of potential jurors.

Television indubitably has a much greater potential impact on jurors than print media. *See Myers,* 635 F.2d at 953 ("[T]elevising the tapes will greatly increase the number of people with knowledge of their content beyond those already aware of the videotaped events through reading press accounts and viewing television newscasts . . . . [S]eeing the tapes on television will [also] create a stronger impression of the events among those who already have been exposed to news accounts of their contents.").

Voir dire would be an insufficient cure if a large segment of the citizens in this district are exposed to the prejudicial information; exclusion of a considerable portion of the population would skew the panel, making it more difficult to find a cross-section of the community. Jurors'

16

assurances that they have not been influenced by media reports are not necessarily dispositive. *Sheppard*, 384 U.S. at 351. Though the internal workings of government may be more worthy of attention, mafiosi personalities and activities retain a powerful hold on the imagination of the citizens of this district. Over the past 5 years the *New York Times* alone has published four hundred articles mentioning the Gotti family. Westlaw, www.westlaw.com (search "Gotti" in New York Times database, limited to articles after April 5, 2001). The name has instant recognizability in the Eastern District of New York—probably far greater than that of any local member of the House of Representatives. *Cf. Myers* at 948 (only half the prospective jurors had ever heard of Abscam; few had more than a "generalized kind of recollection what it was all about"; no tapes had been aired prior to trial).

If the videos were released, they would be likely to command great continuing public attention even after jury selection was completed. The possibility of leakage into the jury room would be substantial. Sequestration of the jury is undesirable. It is costly, makes selecting jurors extremely difficult, and places heavy burdens on jurors that should be avoided.

Because the recordings would be inadmissible at trial, they should not be disseminated until after the trial is over. Even a conscientious juror would find it difficult to avoid the videos. Inevitable repetition by multiple media outlets would almost ensure that jurors would be tainted by direct viewing or by reactions from family and friends.

Once the trial is over, there is no reason why the balance should not be swiftly reconsidered. Any dispute between the media and the Gottis over release of the recordings can be adjudicated at that time.

## IV. Conclusion

The restriction on public and media access to the audio-video recordings is minimal. Nothing has been sealed. Transcripts of the recordings may be copied and distributed. Any member of the press or of the public may view the recordings, unredacted, upon request. All that is prohibited is the distribution and reproduction, before and during trial, of prejudicial evidence inadmissible against the defendant and irrelevant to his guilt. Defendant's Sixth Amendment right to a fair trial requires the protection he is now being afforded.

The motion for reconsideration is granted. Both recordings shall remain available for viewing at the courthouse until the close of trial, when the recordings will be available for duplication. Leave will be granted to a representative of the Gotti family to formally intervene and contest release at any time. Transcripts of the recordings are available immediately upon application to the Clerk of the Court.

To ensure that any decision on this application would be appealable as a final order, a new miscellaneous number has been assigned. *Accord Myers*, 635 F.2d at 949 n.2.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: April 5, 2006
      Brooklyn, New York